UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| KATHRYN LONG, | ) |
| | ) NO. _____ |
| Plaintiff, | ) |
| | ) JURY DEMANDED |
| v. | ) |
| | ) |
| BAPTIST MEMORIAL | ) |
| MEDICAL GROUP, INC. and | ) (Related Case: *Margaret Allgood v. Baptist* |
| BAPTIST MEMORIAL | ) *Memorial Medical Group, Inc. and Baptist* |
| HEALTH CARE CORPORATION, | ) *Memorial Health Care Corporation*, |
| | ) Case No. 2:19-cv-02323-JTF-tmp) |
| Defendants. | ) |

## COMPLAINT

1. Plaintiff Kathryn Long ("Plaintiff" or "Long") files this Complaint against Defendants Baptist Memorial Medical Group, Inc. ("BMMG") and Baptist Memorial Health Care Corporation ("BMHCC")[1] for violating 31 U.S.C. §3730(h)(1), the Tennessee Human Rights Act ("THRA"), and all other relevant laws.[2]

### I. PARTIES

2. Plaintiff, a female, is a resident of Greenwood Springs, Mississippi and worked for Baptist Memorial from 2010 through May 20, 2019 as a Clinic Manager. Prior to working for Baptist Memorial, Plaintiff served as the Clinic Manager in the same clinic, which was owned by a different entity.

---

[1] Because BMMG is a wholly-owned subsidiary of BMHCC, "Baptist Memorial" collectively refers to both BMMG and BMHCC.
[2] Plaintiff has filed a charge of discrimination/retaliation with the Equal Employment Opportunity Commission, which is pending. Once she has met all administrative exhaustion prerequisites, Plaintiff will amend her Complaint to formally assert her related federal claims.

1

3. Defendant BMHCC is a non-profit entity incorporated in Tennessee that operates a network of hospitals, medical centers, and specialty facilities throughout the mid-South. BMHCC's headquarters are located in Memphis, Tennessee.

4. Defendant BMMG is a non-profit entity incorporated in Tennessee and a wholly-owned subsidiary of BMHCC. BMMG operates a multi-specialty physician group practice that manages and develops primary care physicians throughout the Mid-South. BMMG's headquarters are located in Memphis, Tennessee.

5. Defendants are both considered "employers" within the meaning of, and are both subject to, the provisions of Title VII, namely 42 U.S.C. § 2000e(b); and the THRA, namely Tenn. Code Ann. § 4-21-102(5).

## II. Jurisdiction and Venue

6. This Court has subject matter jurisdiction under 28 U.S.C. §1331, §1332 and §1367 and 31 U.S.C. §3730(h)(2) and §3732(a).

7. This Court has personal jurisdiction over Defendants because they are headquartered in this District and many of the employment decisions made in this case occurred in this District.

8. Venue is appropriate under 28 U.S.C. §1391 and 31 U.S.C. §3732(a).

## III. Factual Allegations

9. Plaintiff began working for Baptist Memorial when the practice in which she was working was purchased by it in 2010.

10. Plaintiff had a successful career with its predecessor and also enjoyed a successful tenure with Baptist Memorial until 2015, when she was tasked with the challenge of attempting to

achieve peace in the Golden Triangle Cardiology practice, which was centered around Dr. John King.

11.  Baptist Memorial had long been aware of complaints relating to and unlawful conduct on the part of Dr. King and failed to take appropriate or reasonable action.

12.  During Plaintiff's tenure, Dr. King engaged in unlawful and erratic behavior, including discriminating against female employees by constantly yelling at and demeaning them, and retaliating against any employees who challenged his actions.

13.  For example, in 2016 Dr. King berated his nurse practitioner, who was also his wife, Madelyn King.  While in the office and in front of other, he told her, "shut your c_ck holster before I knock the f_ck out of you."  The employee who heard it, with the assistance of another offended physician, reported Dr. King's behavior to Plaintiff.  Plaintiff reported the unlawful conduct to her Regional Manager, Janet Cranford.  Ms. Cranford instructed Plaintiff to try and dissuade the offended nurse from filing an official complaint.

14.  Following that, Plaintiff continued to report similar matters to Ms. Cranford.  For example, one day Dr. King targeted Plaintiff in front of other employees—yelling and using profanity towards her regarding his schedule.  Another physician who overheard it reported it to Ms. Cranford and Plaintiff confirmed in detail the on-going abuse by Dr. King towards Plaintiff and other female employees and said she was fearful of retaliation.

15.  Shortly after that, Baptist Memorial made Dr. King the Chief of Staff.

16.  In 2018, Dr. King's medical billing procedures came under scrutiny.

17.  Certain of Dr. King's medical billing procedures violated the Medicare rules.

18. Specifically, Dr. King had a practice of billing procedures under his name even when he was not present and did not perform the procedures, but rather, they were performed by a nurse practitioner and they were not under the direct supervision of Dr. King.

19. Under the Medicare rules, under such circumstances, entities are not permitted to bill for such services at 100% of the fee schedule amount, but rather, are only permitted to bill at 85% of the fee schedule.

20. Plaintiff had expressed concerns to Ms. Cranford about these and other of Dr. King's billing practices.

21. For example, Plaintiff told Ms. Cranford that the billing practices in the pacemaker clinic were misleading and that the billing made it appear that Dr. King had performed the procedure when, in reality, Plaintiff frequently had to text Dr. King to see where he was when the procedures were being performed.

22. When Plaintiff told Ms. Cranford about these fraudulent billing practices, Ms. Cranford conceded that it was fraud, but that there was nothing they could do about it and that Baptist Memorial was not going to really get rid of Dr. King.

23. Plaintiff also communicated concern about other billing practices.

24. In 2018, Dr. King had a licensed nurse practitioner, Margaret Allgood ("Allgood"), who worked with Dr. King at Baptist Memorial.

25. Ms. Allgood likewise learned that Dr. King had falsely billed for procedures under his name that he did not perform or supervise.

26. For example, Ms. Allgood observed nurse practitioner, Madelyn King, perform a procedure to remove a heart-monitoring device from a patient of Ms. Allgood's at Baptist Memorial. Dr. King was not present in the operating room during this procedure, contrary to what

Dr. Allgood had been told in advance and therefore what Ms. Allgood had noted in the plan of care for the patient.  Ms. Allgood later received the procedure note for the operation.  It was signed by Dr. King and falsely stated that he had performed the procedure.  Ms. Allgood later learned that Baptist Memorial had billed the procedure under Dr. King's name.

27. Ms. Allgood also learned that Baptist Memorial was billing under Dr. King's name for procedures she herself had performed without the presence of a physician, such as interrogations on implanted heart devices.

28. Ms. Allgood was openly vocal about her objections to the practices and her belief that they consisted of fraud.  Ms. Allgood also called the compliance/ethics hotline about what she believed were fraudulent billing practices by Dr. King.

29. Plaintiff told Ms. Allgood that, although they could face retaliation, she would be truthful (which supported Ms. Allgood) and would continue to report Dr. King's fraud.

30. When an investigation was launched, Plaintiff participated in it and was honest with investigators in support of Ms. Allgood's claims.

31. As a consequence of Ms. Allgood's complaints, Dr. King and Ms. Cranford met with Plaintiff.  They were both livid that Ms. Allgood had gone outside of the clinic to complaint about Dr. King.

32. Dr. King said that Ms. Allgood should be fired and caused Ms. Cranford and Plaintiff to meet with Ms. Allgood to try and get her to apologize to Dr. King.  During the meeting, Ms. Cranford chastised Ms. Allgood for being vocal about the billing issues and for accusing Dr. King of fraud and said the only way the matter could possibly be remedied would be for Ms. Allgood to apologize to Dr. King.

33. Because Baptist Memorial lacked grounds to terminate Ms. Allgood, Dr. King and Ms. Cranford decided to set her up and tried to include Plaintiff, although Plaintiff refused to be complicit.

34. During this process, which did eventually result in Ms. Allgood's leaving Baptist Memorial, Dr. King said, "Who the f_ck does she think she is?" and "I'll fry her ass," to drug representatives and others.

35. Dr. King openly made it clear not to cross him and turn him in.

36. Plaintiff reported Dr. King's retaliatory conduct to Ms. Cranford and asked if she could be transferred from the clinic because she knew that Dr. King associated Plaintiff with Ms. Allgood and was aware that she had also reported his unlawful activities.

37. Plaintiff also discussed these issues with human resources representative, Kimberly Nicholson.

38. Plaintiff also spoke with Amy Pettit in corporate human resources and expressed the same to her. Because Plaintiff feared reprisal and saw what happened to others, she did ask that no formal complaint be filed.

39. In the spring of 2019, Ms. Allgood's federal case was in early stages and the parties to that case were engaging in pre-filing discussions about witnesses and evidence. As part of those discussions, Plaintiff's support of and association with Ms. Allgood became even more clear. Around that same time, Dr. King again became enraged with Plaintiff. One day at work, he cursed at Plaintiff about a patient she had scheduled for him, referring to the patient as a "b_tch." Tired of being his door mat, Plaintiff went to Dr. King's office and confronted him. She asked why he was angry with her. Dr. King made it clear that he blamed Plaintiff for Ms. Allgood's complaints against him. Dr. King talked at length about his hatred for Ms. Allgood, who was pregnant at the

time, and even said he wished Ms. Allgood's baby would die. Ms. Allgood had previously suffered a miscarriage. As Dr. King spoke, he raised his voice, turned red, and even hit his head with his fist.

40. Dr. King also accused Plaintiff in the meeting of angering one of his best nurses and said, "not that I want to f_ck her."

41. Dr. King also criticized Plaintiff for hiring a new employee, referring to her as a "n_gger loving b_tch with a nose ring and colored hair."

42. Following this horrific meeting, Plaintiff went to Ms. Cranford and submitted a written complaint of what Dr. King said to her. This was the first time she officially filed anything on Dr. King. Plaintiff also spoke to human resources about it.

43. Plaintiff then took PTO for one week.

44. Around this time, Madelyn King told other employees that Plaintiff would soon be leaving the clinic.

45. During this time, Dr. King also bashed Plaintiff to others, saying, "she's going to get what she deserves."

46. Shortly after that, Baptist Memorial decided to do "employee surveys" at the clinic.

47. During that process, which was supposed to be part of the investigation of Dr. King, his pet nurses insisted on being interviewed, ostensibly to help Dr. King retaliate.

48. On May 20, 2019, much to her surprise, Plaintiff was terminated by Ms. Cranford and Ms. Pettit. Plaintiff was told that it was "due to findings in the employee surveys" and that they would not give any details or answer any questions.

49. Plaintiff believes she was terminated for complaining about, opposing, participating in an investigation of, speaking out against, refusing to engage in, and having an

association with others who opposed Dr. King's unlawful conduct. This unlawful conduct included, but was not limited to, violations of Title VII and all related state and federal laws prohibiting race and gender discrimination, and violations of the False Claims Act.

50. Plaintiff has filed a charge of discrimination with the Equal Employment Opportunity commission, bearing charge number 494-2019-02867.

## IV. Legal Claims

Count 1 - Retaliation in Violation of 31 U.S.C. §3730(h)(1)

51. Title XVIII of the Social Security Act, 42 U.S.C. §1395, *et seq.*, establishes Medicare, which is a federal operated and funded program. The United States Department of Health and Human Services ("HHS") administers Medicare through the Centers for Medicare and Medicaid Services. The Medicare Claims Processing Manual, Chapter 12, Physicians/Nonphysician Practitioners, §120 provides that: "In general, NPs [nurse practitioners] and CNSs [clinical nurse specialists] are paid for covered services at 80% of the lesser of the actual charge or 85% of what a physician is paid under the Medicare Physician Fee Schedule." Consistent with this instruction, 42 C.F.R. §414.56 limits payment for nurse practitioner services to no more than 85% of the physician fee schedule.

52. Dr. King's and Defendants' false billing practices violated the Medicare reimbursement rules.

53. This caused Defendants to submit false claims through Medicare through the Department of Health and Human Services in violation of 31 U.S.C. §3729.

54. Indeed, following the complaints made by Ms. Allgood and Plaintiff and the ensuing investigation, Defendants eventually self-reported the violations to the federal government and confessed repayment for the same.

55. In the alternative, Plaintiff and others had a good faith belief that Dr. King's and Defendants' practices violated 31 U.S.C. §3729 and all other relevant laws concerning medical billing and false claims.

56. Plaintiff engaged in lawful acts to stop, oppose, complain about, or report Defendants' violations of 31 U.S.C. §3729 and all other relevant laws concerning medical billing and false claims.

57. Plaintiff was also associated with others acting in furtherance of 31 U.S.C. §3729 all other relevant laws concerning medical billing and false claims.

58. Defendants had knowledge of the same.

59. Defendants terminated and/or permitted retaliation against Plaintiff because she engaged in protective activity under 31 U.S.C. §3730(h)(i) and other laws as asserted herein and because she was associated with Ms. Allgood, who also engaged in protected activity under 31 U.S.C. §3730(h)(i).

60. Plaintiff has suffered damages as a result.

Count 2 - Violation of Tenn. Code Ann. § 4-21-301(a)(1) and federal law

61. In complaining about Dr. King's horrific conduct towards and statements about women and minorities, as alleged herein, Plaintiff was engaged in protected "opposition" activity under Tenn. Code Ann. § 4-21-301(a)(1) and federal law.

62. Defendants' decisionmakers were aware of Plaintiff's protected "opposition" activity when they made the decision to terminate Plaintiff's employment.

63. Defendants terminated Plaintiff's employment because of her protected "opposition" activity in violation of Tenn. Code Ann. § 4-21-301(a)(1) and federal law.

64. Because Defendants' decisionmakers were aware that it is illegal to terminate an employee in retaliation for her opposition to sexual and racial harassment and discrimination in the workplace, by firing Plaintiff, they acted with malice or reckless disregard as to whether Plaintiff's federally protected rights were being violated.

65. Plaintiff has suffered damages as a result.

### V. DAMAGES

66. As a result of Defendants' wrongful actions, Plaintiff has suffered both financially and emotionally. In particular, Plaintiff lost and will continue to lose salary, commissions, opportunities and advancement, and various employee benefits, which she would have earned had she been allowed to continue in her employment with Defendants. In addition, Plaintiff has suffered mental anguish, grief, emotional harm, career damage, and reputation damage because of Defendants' wrongful actions.

### VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

a. That the Court issue and serve process on Defendants and require Defendants to answer within the time prescribed by law;

b. That Plaintiff be awarded back pay and all lost benefits of employment;

c. That Plaintiff be awarded damages for emotional grief and anguish, career damage, and reputation damage;

d. That the Court issue an injunction requiring Defendants to re-employ Plaintiff at an equivalent job with all employment rights and benefits to which he would have been entitled but for his unlawful discharge, and without harassment or illegal

  condition imposed on his job; or, in the alternative, front pay and benefits in lieu of reinstatement;

e. That Plaintiff be awarded compensation for special damages caused by Defendants' retaliation against Plaintiff under the False Claims Act in an amount to be proven at trial, including litigation costs and reasonable attorneys' fees, plus pre- and post-judgment interest.

f. That Plaintiff be awarded punitive damages;

g. That Plaintiff be awarded pre-judgment interest;

h. That Plaintiff be awarded attorney fees and costs, and such other and further relief as the Court deems proper or that is or becomes permissible by law; and

i. That a jury try all claims and issues triable by a jury.

    MIKEL & HAMILL PLLC

    By: s/ Donna J. Mikel
      Donna J. Mikel, BPR No. 020777
      620 Lindsay St., Suite 200
      Chattanooga, TN  37403
      Tel: (423) 541-5400
      Fax: (423) 541-5401
      dmikel@mhemploymentlaw.com

    ALLRED, MAROKO & GOLDBERG

      Renee Mochkatel, Esq.
      (Pro Hac Vice will be applied for)
      6300 Wilshire Blvd., Suite 1500
      Los Angeles, CA 90048
      Tel: (323)302-4774
      RMochkatel@amglaw.com

    *Attorneys for Plaintiff*